Filed 2/13/20; Certified for publication 3/10/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUDY ALEXANDER et al., | B279155, B280916 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC426353) |
| v. | |
| COMMUNITY HOSPITAL OF LONG BEACH et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Johnson, Judge. Reversed with directions.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Gary M. Lape, John L. Barber, Laura J. Anson for Defendant and Appellant Community Hospital of Long Beach.

Horvitz & Levy, Jason R. Litt, Bradley S. Pauley; Gordon & Rees, Don Willenburg for Defendants and Appellants Memorial Psychiatric Health Services, Inc., and Memorial Counseling Associates Medical Group, Inc.

Law Offices of Maryann P. Gallagher, Maryann P. Gallagher; Law Office of Shawn Dantzler, Shawn M. Dantzler; Benedon & Serlin, Douglas G. Benedon, Gerald M. Serlin for Plaintiffs and Respondents.

_____

A jury found that a hospital and medical group created a hostile work environment and wrongfully discharged three nurses based on their opposition to a supervisor's harassment, using a pretext that the nurses had abused a patient. The nurses soon found new jobs, but a year later lost them when the State of California filed criminal charges against them for the patient abuse. They were acquitted of the charges. The jury awarded the nurses substantial past and future economic and noneconomic damages suffered up to and after—but not during—their second round of employment. The hospital and medical group appeal, and the nurses cross-appeal.

The hospital and medical group contend insufficient evidence supported the verdict in several respects, the jury improperly awarded damages caused by the criminal prosecution, and the trial court made prejudicial evidentiary errors. The medical group further contends the nurses failed to exhaust their administrative remedies as to it. The nurses argue a second medical group should have been found liable as an alter ego of the first.

We conclude plaintiffs failed to exhaust their administrative remedies against the medical group; insufficient evidence supported some of the jury's findings and its damages awards; and the court made several prejudicial evidentiary errors. We also conclude the second medical group may not be

held liable on an alter ego theory.  We therefore reverse the judgment and remand the matter for further proceedings.

## BACKGROUND

As this matter is before us on appeal from a judgment in favor of the nurses after a jury trial, we view the evidence in favor of the judgment.  (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 694.)

## I. The Nurses' Employment

### A. Community Hospital

#### 1. Employment Structure

Judy Alexander, Johann Hellmannsberger, and Lisa Harris worked as nurses in the Behavioral Health Unit of Community Hospital of Long Beach (Community Hospital or simply the hospital).  All received good reviews.

In 1989, in response to Community Hospital's predecessor's announced plan to close its psychiatric unit, eight psychiatrists founded two corporations to take over the unit's operations.  The first, Memorial Psychiatric Health Services (MPHS), an S-Corporation, was founded to run the hospital's locked mental health ward.  The second, Memorial Counseling Associates Medical Group (MCA), a professional C-corporation, would supply physicians for patients in the ward.

Community Hospital, which no longer operates, contracted with MPHS to operate its Behavioral Health Unit.  Pursuant to the agreement MPHS provided administrative services for the unit and employed and managed its director, Keith Kohl.  Kohl's direct supervisor was Jill Schmidt, MPHS's Vice-President of Operations.

The hospital separately contracted with MCA to provide physicians for the unit.

3

Personnel issues involving employees other than Kohl or the physicians were managed by Valerie Martin, the hospital's human resources director.

2.    Alexander Complained about Kohl's Conduct

As director of the Behavioral Health Unit, Kohl discriminated in favor of male staff—particularly gay men—with respect to scheduling, assignments and promotions; rewarded male employees with gift certificates based on their attire; and regularly used sexually explicit language that favored homosexuality and denigrated heterosexuality.

Alexander felt demeaned and humiliated by Kohl and fearful of his reprisals. She complained four or five times to Adrian Taves, the hospital's director of education, that Kohl was "flamboyantly gay," but was told there was nothing inappropriate about gay mannerisms, and simply to avoid Kohl.

A few weeks before she was terminated, Alexander complained to Taves that Kohl had berated her in his office, and was told to take the complaint to Martin, the human resources director. But Martin told her that the last person who had complained about Kohl was no longer employed by the hospital, and asked Alexander if she was sure she really wanted to make that complaint. Alexander left human resources without filing a formal complaint, and eventually transferred to the night shift to avoid Kohl.

3.    The "Hailey" Incident

During the night shift of April 15, 2009, one of the patients, "Hailey," was yelling, cursing, pacing, punching and kicking the walls. When she threatened Hellmannsberger with violence, Harris and Hellmannsberger each took one of her arms and escorted her to an open seclusion room, which had only a bare

4

bed with no physical restraints. Hailey continued to pace, curse, and kick the walls, and told Hellmannsberger she wanted her "fucking shot" of anti-anxiety medication.

Hellmannsberger obtained a physician's order for the medication, declined the doctor's offer of a physical restraint order, and instructed Alexander to prepare the dosage. In response to Harris's call to another wing, Nurses Dale Ortiz and Russell Green and mental health worker Shenae Berry came to assist. Hailey cooperated, and Alexander administered the shot, after which Hailey calmed down.

4.        Plaintiffs' Termination

The next day, Green and Berry reported to Anthony Pace, the Behavioral Health Unit's Clinical Coordinator, that Hailey had been placed in physical restraints without a physician's order. Pace told Kohl, who told Martin and Tammy Alvarez, the hospital's Chief Nursing Officer. Kohl, Martin and Alvarez decided to suspend Alexander, Harris and Hellmannsberger pending an investigation.

Kohl obtained written statements from Berry (written by her sister) and Green that Hailey had been put in physical restraints. Ortiz, however, told Kohl that Hailey had never been in physical restraints, and was administered only a chemical restraint pursuant to a physician's order.

Kohl instructed Alexander not to report to work for her evening shift, and the next morning, a Friday, he, Martin, and Alvarez suspended her for having placed a patient in physical restraints without a physician's order.

Pace also suspended Harris and Hellmannsberger.

On Monday, April 20, 2009, Martin terminated Alexander. After she stated she would fight the termination, Martin told

5

Alexander she was also being fired for time card fraud relating to a class she had taught some weeks earlier.

Kohl, Martin, Alvarez and Pace offered to let Hellmannsberger keep his job if he would corroborate that Alexander had put Hailey in restraints. Hellmannsberger refused, and was fired.

Martin, Alvarez, and Kohl made the same offer to Harris, who also refused and was fired.

## B.    College Hospital and Criminal Prosecution

Within approximately two months of their termination by Community Hospital, the three nurses found employment at College Hospital in Brea.

Community Hospital reported the Hailey incident to licensing authorities, who notified the Department of Justice. In June 2010, a year into their new employment, the department arrested and prosecuted Alexander, Hellmannsberger and Harris for the illegal restraint of Hailey.

College Hospital suspended the nurses following their arrests, and ultimately terminated their employment.

A jury later acquitted the three nurses of the criminal charges.

## C.    Post-Acquittal Employment

As a result of her termination from College Hospital, Alexander lost her home and lived in her car for a while before moving in with her aunt and eventually finding new work.

Hellmannsberger actively sought work for a year and a half before eventually finding a job as a staff nurse.

Harris passed away in September 2014, having never found another job. Her son was substituted as a plaintiff.

6

## D.  Post-Termination Complaints About Kohl by Other Employees

A few weeks after Community Hospital fired the three nurses, hospital staff complained to MPHS and the hospital that Kohl had created a hostile work environment by favoring male employees, particularly gay males, and openly discussing his sex life in the workplace.  Ana Marie Mesina, MPHS's human resources manager, spoke with Kohl, who denied the allegations.  During the conversation Mesina learned about the Hailey incident, and requested supporting documentation for the nurses' terminations.  Kohl never provided it.

Approximately a year later, Mesina received another complaint about Kohl from Lisa Jackert, a Hospital Senior Case Manager, but conducted no investigation.  After receiving a third complaint about Kohl, Mesina issued him a verbal warning.

In July 2010, more than a year after the nurses were fired, the hospital demanded that MPHS remove Kohl as Director of the Behavioral Health Unit for having "created a hostile work environment."  MPHS responded that Kohl's behavior was "exactly fine," and presented no harassment issue.  MPHS nevertheless removed Kohl from his position after the hospital insisted that it do so pursuant to its management services contract.

## II.  Lawsuit

### A.  FEHA Complaints

Alexander, Hellmannsberger and Harris filed administrative complaints with the Department of Fair Employment and Housing (DFEH) naming the hospital, Keith Kohl, and Anthony Pace as potential defendants.  They alleged gender and sexual orientation discrimination, and retaliation in

7

violation of the Fair Employment and Housing Act.  (Gov. Code, § 12900 et seq.; FEHA.)[1]  The nurses filed a second set of complaints on July 9, 2009, naming MCA as an additional potential defendant.

The DFEH closed the complaints effective July 9, 2009, because the nurses had requested immediate right-to-sue notices, and on August 27 the DFEH notified the nurses of their right to file a civil action within one year of the notice.  Right-to-sue notices were also sent to Kohl and to the human resources directors at both the hospital and MCA.

The nurses failed to mention MPHS, Kohl's actual employer, in any administrative complaint.

The nurses filed the instant civil action against the hospital and MCA on November 19, 2009, asserting causes of action for (1) sexual harassment; (2) sexual orientation discrimination; (3) failure to investigate and prevent harassment and discrimination; (4) retaliation; (5) wrongful termination in violation of public policy; (6) intentional infliction of emotional distress; (7) defamation; and (8) negligent supervision.  They alleged that the hospital permitted Kohl to create a hostile work environment by flaunting his LGBT lifestyle, making sexual references, and giving preferential treatment to male employees, and the hospital retaliated against them when they complained.

The nurses amended their civil complaint on May 21, 2010, to name MPHS as a Doe defendant.  They never filed any administrative complaint against MPHS.

---

[1] Undesignated statutory references will be to the Government Code.

8

**B.     Civil Trial**

At trial, Alexander testified that Kohl made explicit references to gay sex while working in the Behavioral Health Unit, sat on a male nurse's lap and allowed the nurse to sit on his lap, told her that a new haircut made her look like a "dyke," and gave male nurses preferred shifts, schedules, and work assignments.  She testified that after her arrest and discharge from College Hospital she "went into depression."

Hellmannsberger, a heterosexual male, testified that Kohl's demeanor toward women was "less respectful" than toward men, and "a number of times" he observed Kohl reassign women from the preferred "A" unit in the Behavioral Health Wing to the less desirable "B" unit to accommodate male friends who wanted to work in the A unit.  He testified that Kohl and Anthony Pace, who was unqualified to perform his work tasks, would "frequently" "spend time together."  (Pace was never identified in the record as homosexual.)  On one occasion Kohl stated he was "upset" with two of the Filipino nurses, and "tired of the Filipino mafia."  Hellmannsberger testified that after his arrest and discharge from College Hospital, he was no longer a "happy, upbeat social person."

Portions of Harris's deposition testimony were read to the jury.  Harris had testified that she remarked to Kohl that Pace was unqualified for his position.  She asked him whether Pace had any experience, to which Kohl had replied, "No, not really, but he has a nice ass."

Lectricia Smith, a nurse, testified that on one occasion in 2009 or 2010 she overheard Kohl tell a person working in the psychiatric unit, whom she could not see or identify, that plaintiffs had been fired because they committed patient abuse

9

and were going to jail. Smith did not know what had preceded the statement or what Kohl was doing at the time.

Patricia Tomlinson Sanchez, a nurse at the hospital, testified that a memo posted at the A Unit nurse's station informed employees they "could not go to HR." Sanchez testified the memo purported to be from Jill Schmidt, MPHS's Vice-President of Operations, and bore the MCA logo, but Sanchez could not identify when the memo was posted, by whom or for how long, nor whether any hospital manager knew about it. Nor could Schmidt recall anything else the memo said, and the memo itself was never produced.

Plaintiffs' economic expert, Venita McMorris, calculated Alexander's loss of earnings as $122,131, Hellmannsberger's as $97,165, and Harris's as $165,677.

Dr. Lee Yoseloff, the president of MPHS, Ana Marie Mesina, MPHS's HR manager, and Valerie Martin, the hospital's HR director, testified MPHS and the hospital had zero tolerance policies regarding sexual harassment and sexual orientation discrimination.

In rebuttal to the hospital's claim that it maintained anti-harassment policies, plaintiffs offered three letters the hospital received after plaintiffs were terminated.

The first, received by the hospital in May 2009, was anonymously ascribed to "BHU," the hospital's behavioral health unit. It stated that the hospital was "a hostile work environment," and Kohl was "encouraging a hostile work environment" by showing "favoritism to male employees." The letter stated that Kohl "gives them gift certificates for dressing a certain way or coming in to work on time but does not show any appreciation for the female staff," and "the 4 people that he has

10

hired have all been males.  [Kohl] sits in the office and discusses his gay sex life with staff," and "if you're not male you get no appreciation, no acknowledgment. . . .  [W]hat used to be a well oiled machine, not perfect but happy is now a very unhappy place to work."

The second letter, dated May 24, 2010, was written by Lisa Jackert, a Senior Case Manager for the hospital.  The letter stated that on May 18, 2010, Kohl "was discussing a topic not on the agenda [at a staff meeting] where [he] mentioned that [the hospital] did not participate in [a] Gay Pride Festival . . . because 'the hospital is homophobic.'  He went on and basically 'outed' two of the physicians on staff by complaining that they should be more vocal about marketing . . . the hospital to the gay community."  When asked whether one of the physicians was gay, "[Kohl] responded, 'All you have to do is take one look at her.'  [¶] He went on to also 'out' a newly hired LVN . . . by saying . . . [that she would have been] willing to be there and stand behind the hospital's table.' "  The letter further stated that Kohl complained that a hospital ad posted on a bulletin board in the break room which depicted "a young man with a bare chest" was taken down "due to 'homophobia.' "  The letter concluded that a nurse complained to Jackert after the meeting about Kohl "basically calling everyone 'homophobic,' " but said he would not complain to Human Resources "for fear of losing his job."  Jackert later testified to the facts stated in her letter.

A third letter, dated May 25, 2010, also anonymous, basically repeated the allegations of the other two letters.

The court instructed the jury that "these letters were admitted for the limited purpose of proving notice to the

11

defendants and you must not consider these three letters as proof that the facts stated in them are true."

On August 19, 2016, the jury found against the hospital on all causes of action, but found for MCA on all causes of action. It found against MPHS on plaintiffs' FEHA causes of action, and on their common law cause of action for negligent supervision and Alexander's claim of retaliation, and found against plaintiffs on their other claims against MPHS.

The jury awarded damages totaling $4,734,973, comprising awards for past economic damages through January 2016; awards to Alexander and Hellmannsberger of $800,000 each in past noneconomic damages; $250,000 each for injury to their reputations; $250,000 to Alexander and $300,000 to Hellmannsberger in future noneconomic damages; and a total of $1.7 million in punitive damages. The court entered judgment accordingly.

### C. Motions for JNOV and New Trial

After judgment was entered, the hospital, MPHS and plaintiffs moved for judgment notwithstanding the verdict (JNOV) and a new trial. Other than reducing Harris's punitive damages award, the trial court denied the motions.

MPHS, the hospital, and plaintiffs timely appealed.

### DISCUSSION

### I. MPHS's Appeal

MPHS contends the judgment against it must be reversed with directions to enter judgment in its favor because plaintiffs failed to exhaust their administrative remedies with respect to their FEHA claims, and insufficient evidence supports the verdict with respect to their negligent supervision claim.

12

### A.    Failure to Exhaust Administrative Remedies

MPHS, which employed Kohl, argues it cannot be held liable as a matter of law for plaintiffs' FEHA claims because plaintiffs failed to exhaust their administrative remedies, in that they failed to mention MPHS in their administrative complaints. We agree.

FEHA makes it an unlawful employment practice for an employer to harass or discriminate against an employee based on the employee's sexual orientation, to fail reasonably to investigate a complaint of harassment or discrimination, or to retaliate against an employee for making such a complaint. (§ 12940, subds. (a), (h), (j) & (k).)

"Any person claiming to be aggrieved by an alleged unlawful practice may file with the [DFEH] a verified complaint, in writing, that *shall state the name and address* of the . . . employer . . . alleged to have committed the unlawful practice complained of, and that shall set forth the particulars thereof and contain other information as may be required by the department." (§ 12960, subd. (b), italics added.) The aggrieved person has one year from the date of the alleged unlawful practice to file such a complaint. (§ 12960, subd. (d).)

Once the DFEH receives an aggrieved person's complaint, it must investigate the alleged unlawful practice and determine whether it can resolve the matter "by conference, conciliation, and persuasion." (§ 12963.7, subd. (a).) If such measures fail, the department may issue an accusation to be heard by the Fair Employment and Housing Commission. (§§ 12903, 12963.7, 12965, subd. (a), 12969.) If that commission finds a violation, it may issue a cease and desist order and grant other appropriate relief. (§ 12970, subd. (a).) If the department issues no

13

accusation, it must give the aggrieved person notice and a right-to-sue letter.  (§ 12965, subd. (b).)  The aggrieved person may, within one year after receiving notice, bring a civil action against the "person, employer, labor organization, or employment agency" named in the charge.  (§ 12965, subd. (b).)

This administrative procedure presents a streamlined and economical way to resolve employment practice disputes outside civil litigation.

The aggrieved person must exhaust this administrative remedy before bringing a civil FEHA action.  (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1121.)

We review de novo whether the doctrine of exhaustion of administrative remedies applies in a given case.  (*Coastside Fishing Club v. California Fish & Game Com*. (2013) 215 Cal.App.4th 397, 414.)

Here, plaintiffs mentioned MPHS nowhere in their FEHA complaint, which constitutes a failure to exhaust their administrative remedies against MPHS and precludes their bringing a civil FEHA action against it.  (*Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1061 (*Valdez*); *Cole v. Antelope Valley Union High School Dist*. (1996) 47 Cal.App.4th 1505, 1511, 1515 (*Cole*) ["to bring a civil lawsuit under the FEHA, the defendants must have been named in the caption or body of the DFEH charge"].)

Citing no pertinent authority, plaintiffs argue an equitable exception to the rule that a FEHA defendant must have been named in a DFEH complaint exists where the defendant received actual notice of the complaint and an opportunity to participate in the administrative process.  They argue MPHS had actual notice of their FEHA complaints because the DFEH served them

14

on MCA by way of Ana Marie Mesina, MCA's director of human resources, who also functions as the human resources director for MPHS. We disagree.

First, no California authority supports the exception. Plaintiffs rely on *Martin v. Fisher* (1992) 11 Cal.App.4th 118, 122 and *Saavedra v. Orange County Consolidated Transportation etc. Agency* (1992) 11 Cal.App.4th 824, 826-827, but in both of those cases the offending individual was named in the body of a DFEH complaint. Under *Cole* and *Valdez*, plaintiffs' failure even to mention MPHS in their DFEH complaint is fatal to their right to bring a civil FEHA action against it.

Second, even were we empowered and inclined to carve an equitable exception out of mandatory statutory language where an unnamed defendant receives actual notice of a FEHA complaint, we would not do so here because the DFEH, for one, had no notice that plaintiffs intended to accuse MPHS, and thus had no opportunity to contact MPHS, investigate its involvement in the alleged unlawful practice, or seek to resolve the matter by conference, conciliation, and persuasion. Further, even though MPHS may have known (by way of Mesina) that plaintiffs *could* have named it in their administrative complaint, it was entitled to rely on their failure to do so as evidence that they did not intend to pursue a civil complaint against it, at least not until they had filed new administrative complaints.

Plaintiffs alternatively argue they satisfied the exhaustion requirement because MPHS was neither known to them nor reasonably discoverable within a year after their terminations. (See *Valdez*, *supra*, 231 Cal.App.3d at p. 1061 [a FEHA claimant need only name "known or reasonably obtainable defendants" in a DFEH charge].) This is so, plaintiffs argue, because evidence at

15

trial revealed that MPHS employees mistakenly referred to themselves as MCA employees; Kohl himself—as well as several hospital employees, including plaintiffs and Susan Byrne, the hospital's Administrative Director of Professional Services—believed he was an MCA employee; and Martin, the hospital's human resources director, mistakenly believed that MCA rather than MPHS had contracted with the hospital to manage the Behavioral Health Unit.

But this merely demonstrates a widespread misconception about the identity of Kohl's employer; it fails to demonstrate plaintiffs could not have cleared up the misconception—as eventually it was cleared up—through reasonable efforts exercised in a timely fashion, for example by obtaining the management services contract from the hospital or Kohl's employment contract from MPHS. Plaintiffs argue MPHS and MCA affirmatively marketed themselves to the public as a single entity, but even if this were relevant, the sole evidence upon which they rely for this proposition—a promotional poster containing the initialism "MCA/MPHS"—moots the argument because plaintiffs failed to name this entity in their administrative complaint either.

### B.  Insufficient Evidence Supports the Negligent Supervision Verdict

MPHS argues no substantial evidence supports their liability for negligent supervision of Kohl because no evidence suggested they were aware before plaintiffs were terminated that Kohl had created a hostile work environment. We agree.

A judgment supported by substantial evidence will be upheld even if contrary evidence exists that might have caused the jury to render a different verdict. (*In re Dakota H.* (2005) 132

Cal.App.4th 212, 228.)  We "presume the judgment is correct, indulge every intendment and presumption in favor of its correctness, and start with the presumption that the record contains evidence sufficient to support the judgment."  (*Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1251.)  A judgment must be reversed "if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support."  (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

An employer can be held liable for negligent supervision if it knows or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness.  (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 843.)  "[T]here can be no liability for negligent supervision 'in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised.' "  (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 395.)

Here, Memorial Hospital received several complaints about Kohl after plaintiffs were terminated, but there was no evidence of any complaint communicated to MPHS during plaintiffs' employment.

Plaintiffs argue that Alexander complained about Kohl to Adrian Taves, the hospital's director of education, and to Martin, the hospital's human resources director, but no evidence suggested that Taves or Martin communicated Alexander's complaint to MPHS.

Plaintiffs argue MPHS's ignorance was engineered, as a nurse testified that a memo in the Behavioral Health Unit and

17

bearing the name of an MPHS director informed hospital employees that they, in the words of the nurse, "could not go to HR." But no evidence indicated what exactly the memo said or who posted it, or when or for how long. It is possible that the memo instructed employees not to go to MPHS's HR department with complaints about nurses, which would have been more appropriately addressed to the hospital's HR department. In any event, an employee's vague, incomplete interpretation of a memo that was never quoted, produced, or authenticated fails to establish MPHS had imputed reason to believe Kohl was unfit.

Plaintiffs argue that before trial MPHS successfully moved in limine to exclude the testimony of former hospital employees Florina Mondina and Bennie Green, who would have testified they had complained about Kohl—and MPHS was on notice of the complaints—before April 2009, when plaintiffs were discharged. Plaintiffs argue the doctrine of invited error precludes MPHS from now arguing that insufficient evidence supported the verdict. We disagree.

Plaintiffs represented to the trial court only that Mondina's testimony would show Kohl falsely accused employees of patient abuse, Mondina complained to the *hospital's* human resources department, and the hospital took no action. They also represented her testimony would impeach Kohl regarding the extent of his disciplinary authority. Plaintiffs argued Green's testimony was relevant to rebut the defense's showing that Kohl had no discriminatory intent. Plaintiffs did not inform the court that Mondina's or Green's testimony was relevant to show *MPHS* knew about Kohl's unfitness during the relevant period.

The court found Mondina's and Green's testimony had only limited relevance, and would result in the undue consumption of

18

time.  Specifically as to Mondina, the court found her testimony would result in a "trial within a trial:  why Mr. Kohl took action against her, who he talked with, all of the things he relied upon in making his decision about her."

A trial court has broad discretion to exclude relevant evidence on the ground it would consume too much time or result in confusion.  (Evid. Code, § 352.)  To demonstrate the exclusion was improper, the offering party must show that the "substance, purpose, and relevance of the excluded evidence was made known to the court . . . ."  (Evid. Code, § 354, subd. (a); *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1176 [offer of proof must be sufficiently specific so that trial court can rule knowledgeably on the issue].)

Assuming for the sake of argument that Mondina's and Green's testimony would have established MPHS's advance knowledge of Kohl's unfitness, there was no way for the trial court to know that because plaintiffs did not proffer the evidence for that purpose.  Perhaps the court's Evidence Code section 352 calculus would have led to a different ruling had plaintiffs explained the additional relevance of the evidence.  But because they did not, they cannot now argue the trial court erred.

### C.    Conclusion

MPHS was found liable only for FEHA violations and negligent supervision.  But plaintiffs' failure to exhaust their administrative remedies precludes their FEHA claims, and no substantial evidence supports the verdict with respect to their common law claim.  Therefore, the judgment against MPHS must be reversed and a new judgment entered in its favor.

19

## II.     Plaintiffs' Cross-Appeal

The jury found MCA was not liable either directly or under partnership or joint venture theories.  After judgment was entered, plaintiffs moved for a JNOV, seeking leave to amend the complaint to conform to proof and allege MCA was MPHS's alter ego.  Plaintiffs also sought leave to amend the judgment to add MCA as a judgment debtor as MPHS's alter ego.

In their cross-appeal, plaintiffs contend MCA was liable as MPHS's alter ego, and the trial court erred in denying their JNOV motion on this issue and their motion to amend the complaint to conform to proof.

Whether or not MCA was MPHS's alter ego, our holding that MPHS is not liable under either FEHA or the common law moots all but one issue raised by the cross-appeal.

"Alter ego" liability attends where "a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." *(Mesler v. Bragg Mgmt. Co.* (1985) 39 Cal.3d 290, 300.)  Under the alter ego doctrine, "[a] corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the [owner] of a corporation liable for the actions of the corporation." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.)  "Two requirements must be met to invoke the alter ego doctrine:  (1) '[T]here must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist'; and (2) 'there must be an *inequitable result* if the acts in question are treated as those of the corporation alone.' " (*Turman v. Superior Court* (2017) 17 Cal.App.5th 969, 980-981.)

20

To determine whether a sufficient unity of interest and ownership exists between two entities, the court considers commingling of assets, identical ownership, use of the same offices and employees, disregard of corporate formalities, identical directors and officers, "and use of one as a mere shell or conduit for the affairs of the other." (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1342.) "Inadequate capitalization of the original judgment debtor is another factor." (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 281.)

Plaintiffs adduce evidence that MCA and MPHS commingled funds, had identical ownership, shared offices, officers, and employees, and disregarded corporate formalities.

Assuming this is true, however, none of it resulted in an inequity because neither entity is liable to plaintiffs. MCA was found not liable by a jury, and we hold, *ante*, that MPHS cannot be liable either. The only possible inequity would be if MCA's concealed unity with MPHS caused plaintiffs to fail to name MPHS in their administrative complaints.

Plaintiffs argue this is indeed the case, because "MPHS and MCA did their best to obfuscate their relationship with each other and Kohl's employer." But as discussed above, the issue is not whether the identity of MPHS as Kohl's employer was unknown to plaintiffs—due to artifice or otherwise—but whether it was reasonably discoverable. Even if everything plaintiffs say is true, they have failed to establish, and do not claim, that MPHS's identity as Kohl's employer was unascertainable through civil discovery.

We conclude the trial court properly denied plaintiffs' requests to amend the complaint or judgment to name MCA as MPHS's alter ego.

## III.  Community Hospital's Appeal

Plaintiffs sued Community Hospital for (1) sexual harassment; (2) sexual orientation discrimination; (3) failure to investigate and prevent harassment and discrimination; (4) retaliation; (5) wrongful termination in violation of public policy; (6) intentional infliction of emotional distress; (7) defamation; and (8) negligent supervision.

At the close of plaintiffs' case the court granted nonsuit as to Hellmannsberger's and Harris's causes of action for retaliation, and as to Harris's cause of action for intentional infliction of emotional distress.  Alexander and Hellmannsberger later dismissed this latter cause of action as to themselves as well, and the court granted a directed verdict as to Harris's cause of action for harassment.

The causes of action that reached the jury were:  (1) sexual harassment (Alexander and Hellmannsberger only); (2) sexual orientation discrimination; (3) failure to investigate and prevent harassment and discrimination; (4) retaliation (Alexander only); (5) wrongful termination in violation of public policy; (6) defamation; and (7) negligent supervision.

The jury found against Community Hospital on these causes of action.

The jury awarded damages to Alexander and Hellmannsberger for past economic and non-economic loss, future non-economic loss, and injury to reputation; and to Harris for past economic loss.  "Past" losses included those suffered up to June 2016, the beginning of trial.  After a second phase of the

22

trial, the jury awarded plaintiffs punitive damages against the hospital, which the trial court later vacated on the ground that the hospital was insolvent.

### A.    Evidence that Plaintiffs had "Cleared their Names" Was Inadmissible

A year after Community Hospital terminated their employment, plaintiffs were arrested and prosecuted for abusing Hailey, but were ultimately acquitted.

Before trial, the court granted motions in limine to exclude all reference to these criminal proceedings.

At trial, Alexander and Hellmannsberger testified, and their counsel repeatedly argued, that their "names" were ultimately "cleared."

Community Hospital contends the trial court erroneously admitted evidence that the plaintiffs had cleared their names, arguing the reference can only be to the criminal proceedings, in violation of the court's in limine rulings.  We agree.

"Except as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351.)  Relevant evidence is that which tends in reason to prove or disprove a disputed fact of consequence.  (Evid. Code, § 210.)  A trial court must limit the introduction of evidence and argument to relevant and material matters.  (Evid. Code, § 1044.)

FEHA makes it "an unlawful employment practice" to discriminate against a person "in terms, conditions, or privileges of employment" based upon sexual orientation.  (§ 12940, subd. (a).)  Because direct evidence of an unlawful discrimination is seldom available, courts use a system of shifting burdens to aid in the presentation and resolution of such claims at trial.  (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 354.)  To establish a

23

prima facie case of discrimination under FEHA, the employee must demonstrate that the employer had a discriminatory motive. The employer may rebut the showing by producing admissible evidence that it discharged the employee for a legitimate nondiscriminatory reason. If it does so, the burden shifts to the employee to produce substantial evidence that the employer's justification for its decision is either untrue or pretextual or that the employer acted with discriminatory animus. (*Id.* at pp. 355-356.)

Here, whether there was reason to believe plaintiffs abused Hailey, and concomitantly whether they were eventually cleared of that charge, was directly relevant to the existence of a nonretaliatory reason for their termination.

However, "a judgment of acquittal in a criminal case is not competent evidence in a subsequent civil action to prove the innocence of the accused." (*Gibson v. Gibson* (1971) 15 Cal.App.3d 943, 947-948.) Therefore, although a discrimination plaintiff must be permitted to prove the pretextual nature of the employer's justification for terminating the plaintiff's employment, evidence that the plaintiff was acquitted of charges raised by the employer is inadmissible for that purpose.

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900.) "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) . . . the error or errors complained of resulted

24

in a miscarriage of justice." (Evid. Code, § 353.) An evidentiary error results in a miscarriage of justice when the reviewing court, " 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

At trial, Hellmannsberger testified he was suspended from College Hospital when criminal charges were filed, and terminated when he failed to provide documentation that he had been "cleared of patient abuse charges." He testified he ultimately provided that documentation, but too late to be reinstated, because "The minute order was not provided." A short time later, Hellmannsberger's counsel published to the jury a College Hospital document stating Hellmannsberger was terminated "due to failure to provide court documentation."

Alexander similarly testified that College Hospital suspended her after her arrest, and told her the suspension would last "until she could provide proof or [*sic*] clearing my name." Alexander testified she eventually got documentation "clearing" her name.

In closing argument, plaintiffs' counsel said that the hospital had caused them to "get arrested," which required that "they had to clear their name. They had to go through prosecution."

The multiple references to having been cleared can only mean plaintiffs were acquitted of criminal charges. Plaintiffs presented no evidence at trial, and do not claim on appeal, that any agency "cleared" them. The closest they come is to argue that their testimony "could just as easily refer to 'clearing their

25

names' before the Nursing Board."  But there would have been no way for the jury to make this connection, i.e., disassociate plaintiffs' exoneration from the immediately preceding—in both testimony and argument—"arrest" and "prosecution," and instead attach it—with no evidence or direction—to some nursing board proceeding.

Admission of this evidence was therefore error.

The prejudicial impact of the error is patent.  Plaintiffs' criminal proceedings were directly relevant to whether Community Hospital terminated them on a pretext.  For example, evidence that the Department of Justice had conducted its own independent investigation and found there was at least probable cause to prosecute would have supported defendant's claim that plaintiffs were fired because they abused a patient.  Plaintiffs' insinuation that criminal proceedings ended in their favor could have been counterbalanced only by the equally improper defense insinuation that criminal prosecutions do not generally proceed absent the prosecuting agency's independent investigation and finding of probable cause.  For the court to permit plaintiffs to insinuate they had been "cleared" of criminal charges, while at the same time muzzling any defense suggestion that the charges were supported by probable cause, predestined the result by leaving the jury no choice but to infer the termination was pretextual.

We are thus well satisfied that it is reasonably probable a result more favorable to the hospital would have been reached in the absence of the error.

26

**B.    Evidence Of Post-Termination Communications Was Inadmissible**

Community Hospital terminated plaintiffs' employment in April 2009.

At trial, plaintiffs introduced evidence of:  (1) An anonymous May 2009 letter received by the hospital complaining that Kohl had created a hostile work environment by favoring male employees, particularly gay males, and openly discussing his sex life in the workplace; (2) a May 2010 letter sent to the hospital by Lisa Jackert, a hospital senior case manager, complaining about Kohl's conduct at a staff meeting, where he accused the hospital of being homophobic, "outed" several physicians and staff members as gay, made comments about their appearance, and posted the cover of a gay magazine in the nurses' station showing a bare chested man; and (3) a May 2010 letter sent to the hospital by Patricia Tomlinson Sanchez, an RN, complaining that Kohl had created a hostile work environment.

The trial court admitted the evidence, and it was discussed at length by several witnesses, including Jackert.

The court gave two contradictory jury instructions regarding the letters.  During trial, the court instructed that a "limited purpose" of the May 2010 correspondence was to show that defendants had received a complaint about Kohl, but if Jackert testified about the letter, the jury could consider it for the truth of the matters asserted.

Jackert did testify.

At the conclusion of trial the court changed its position, and admonished the jury that the letters "were admitted for the limited purpose of proving notice to the defendants, . . . not . . . as proof that the facts stated in them are true."

The hospital contends the letters were inadmissible hearsay, and their admission constituted prejudicial error. We agree.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is inadmissible unless an exception applies. (*Id*. at subd. (b).) An out-of-court statement is not hearsay if offered to prove something other than its truth, for example to explain an action the recipient took in reliance upon it. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 591.)

Here, plaintiffs' theory was that Kohl created a hostile work environment by giving preference to the male staff, particularly other gay men, and by using offensive sexual language, and the hospital created an environment where employees were afraid to complain. One of the hospital's claims in rebuttal was that it had created no such environment, but on the contrary maintained a zero tolerance policy regarding sexual orientation discrimination and harassment and encouraged employees to report any harassment.

But the three letters were inadmissible on all of these issues because they constituted out-of-court statements, and thus could not be considered for the truth of anything stated in them. They could not, for example, prove that Kohl created a hostile work environment, that the hospital created an environment where employees were afraid to complain, or that the hospital failed to investigate a credible allegation of harassment. (That an allegation was credible would have been one of the "truths" that the hearsay was incompetent to establish.) Their only

28

proper purpose was to show the hospital had received a complaint about Kohl's unfitness as an employee. Assuming the hospital did nothing about the complaint, the letters might have been relevant to support plaintiffs' cause of action for negligent supervision, but only if they were sent before plaintiffs were terminated. (See discussion, *post*.) They were not.

Therefore, the court's attempt to instruct the jury to consider the letters only for the limited purpose of proving notice (of some unspecified fact) failed to cure the error.

Plaintiffs argue the three letters were admissible under subdivision (b) of Evidence Code section 1101 to prove Kohl's discriminatory intent. The argument is without merit.

Under Evidence Code section 1101, evidence of uncharged offenses or misconduct is inadmissible to prove an actor's propensity to commit misconduct, but may be admitted if relevant to prove a material fact such as the actor's motive or intent. (Evid. Code, § 1101 subds. (a) & (b); *People v. Kelly* (2007) 42 Cal.4th 763, 783.) Evidence of an uncharged offense is relevant to prove motive or intent where similarities between the uncharged offense and the charged offense support an inference that the defendant harbored the same intent both times. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) For example, evidence of workplace misconduct of the same nature as that of which a plaintiff complains is admissible because it is probative of the employer's motive for discrimination and informs whether an employer's proffered reason for an adverse employment action is pretext. (*Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 871-873 [evidence of sexual harassment against other employees]; *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 296-298 [evidence of retaliation against other employees].)

29

But an *out-of-court* statement concerning an uncharged offense is inadmissible to prove the truth of the matter stated.

Here, the only permissible purpose of the letters was to prove that the *hospital* was put on notice of Kohl's unfitness. They were admitted and considered by the jury only for that purpose, and were inadmissible to prove Kohl's motive or intent.

The question remains whether it is reasonably probable a different result would have been reached without admission of the three letters. We conclude it is.

Plaintiffs focused on the letters extensively at trial. They questioned Sarkis Arevian, MPHS's vice president, about the 2009 and May 2010 letters, and whether Kohl had outed physicians. Jackert herself testified about the contents of her May 2010 letter. Ana Marie Mesina, the HR Manager for MPHS, was examined at length concerning anonymous letter in which Kohl was alleged to have accused the hospital of being homophobic. Valerie Martin was asked about statements in the May 2010 letter. Kohl testified about matters raised only in the May 2010 letter. Michelle Boswell, a former RN at the hospital, was asked whether she would have found it disturbing had Kohl outed people at a meeting in 2010. And Patricia Tomlinson Sanchez testified about writing an anonymous handwritten letter to MCA containing the statements made in the anonymous typewritten May 2009 letter.

Other than the letters, plaintiffs' evidence consisted of the testimony of several witnesses that Kohl had created a hostile work environment; and the hospital's evidence consisted of the testimony of several witnesses that he had not. Although the trial court itself said some of the defense witnesses were not credible, we think it at least reasonably probable that plaintiffs'

30

repeated reliance on the three inadmissible letters had its intended effect of swaying the jury.

## C. Insufficient Evidence Supported Hellmannsberger's FEHA and Wrongful Termination Claims

The hospital contends no substantial evidence supports Hellmannsberger's FEHA or wrongful termination claims because no evidence suggested that he, a heterosexual male, was targeted by Kohl. We agree.

To prevail on a claim of harassment so severe or pervasive as to create a hostile work environment, an employee "must demonstrate that the conduct complained of was *severe enough or sufficiently pervasive* to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees *because of their sex.* [Citations.] . . . [A] workplace may give rise to liability when it 'is permeated with "discriminatory [sex-based] intimidation, ridicule, and insult," [citation], that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." ' " (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 278-279 (*Lyle*).)

An employee's work environment is affected not only by conduct directed at the employee but also by the treatment of others. (*Beyda v. City of Los Angeles* (1998) 65 Cal.App.4th 511, 519.) To establish a hostile work environment caused by the treatment of others, the plaintiff generally must show that the harassment directed at others was in his immediate work environment, and that he personally witnessed it. (*Lyle*, *supra*, 38 Cal.4th at p. 285; see *Miller v. Dept. of Corrections* (2005) 36 Cal.4th 446, 466 [an employee may "establish an actionable claim

31

of sexual harassment under the FEHA by demonstrating that widespread sexual favoritism was severe or pervasive enough to alter his or her working conditions and create a hostile work environment"].)

Here, Hellmannsberger testified he: (1) Observed Kohl on a number of occasions reassign women from the preferred "A" unit in the Behavioral Health Wing to the "B" unit to accommodate two male friends—"some gay, some not"—who wanted to work in the A unit; (2) heard Kohl state on one occasion that he was "upset" with two of the Filipino nurses, and "tired of the Filipino mafia"; and (3) observed Kohl "frequently" spend time with Anthony Pace, who was unqualified to perform his work tasks.

(Hellmannsberger argues he also testified on another occasion that Kohl used his position to promote other gay male staff. However, that testimony occurred at deposition, not trial. At trial, plaintiffs' counsel read from Hellmannsberger's deposition, in which he had said, "I believe [Kohl] showed favoritism towards [gay men] just on his demeanor." Counsel then asked, "That was your deposition under oath in March of 2014?" To which Hellmannsberger replied, "Yes, Ma'am.")

"Minor or relatively trivial adverse actions or conduct . . . cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable" under FEHA. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1054.) "Requiring an employee to prove a substantial adverse job effect 'guards against both "judicial micromanagement of business practices," [citation] and frivolous suits over insignificant slights.' " (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1455.) " '[W]ork places are rarely

idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.' [Citation.] If every minor change in working conditions or trivial action were a materially adverse action then any 'action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511.)

One instance of referring to Filipina nurses outside their hearing as "mafia," another of hiring and spending time with an unqualified male employee (who was not identified in the record as homosexual), and an indeterminate number of instances where female employees were replaced by male employees— "some gay, some not"—in choice assignments, fails as a matter of law to establish widespread sexual favoritism so severe or pervasive as to alter Hellmannsberger's working conditions or create a hostile work environment.

### D. Insufficient Evidence Supported Plaintiffs' Defamation Claims

The hospital contends the jury's verdict on plaintiffs' defamation claims was unsupported by substantial evidence. We agree.

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) To be vicariously liable for the publication of another under the doctrine of respondeat superior, the employee or agent must have been "acting in the scope of his authority and in furtherance of the

33

employer's business." (*Sanborn v. Chronicle Publishing Co.* (1976) 18 Cal.3d 406, 411.)

Here, Lectricia Smith testified that on one occasion in 2009 or 2010 she overheard Kohl tell a person working in the psychiatric unit that plaintiffs had been fired because they committed patient abuse and were going to jail. Smith could not identify the person to whom Kohl spoke, and did not know what had preceded the statement or what else Kohl was doing at the time.

There was no evidence at all that the hospital authorized Kohl to make the statement or that he was speaking within the scope of his duties and in furtherance of the hospital's interests. Lacking such evidence, a single instance of gossip by Kohl at work cannot be imputed to the hospital, and thus fails to establish plaintiffs' defamation claims.

### E. Insufficient Evidence Supported any Employee's Negligent Supervision Claim

The hospital contends no substantial evidence supported its liability to Alexander and Harris for negligent supervision of Kohl because no evidence suggested it was aware before Kohl committed misconduct that he had a propensity to do so. We agree.

"[A]n employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee. [Citation.] Liability is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes." (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038, 1054.) "To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over the actor had *prior*

knowledge of the actor's propensity to do the bad act." (*Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889, 902, italics added.)

Here, plaintiffs alleged that Kohl "had a history of sexual harassment and creating a hostile work environment at other jobs before he worked for defendants[,] and if defendants had conducted a thorough background check they would have discovered this and[,] not hired Kohl or given him the authority over the plaintiffs that they did. [¶] After Kohl began working for defendants, he began sexually harassing employees, creating a hostile work environment, favored homosexual employees and male employees over female employees and actively pursued anyone who stood up to him so that they would be terminated from their employment. [¶] After Kohl began working for defendants, they knew or should have know[n] of his illegal improper behavior[,] . . . and ratified that conduct by failing to take any action against Kohl . . . ." (Capitalization standardized.)

But no evidence suggested the hospital was put on prior notice of any misconduct by Kohl. Plaintiffs presented evidence that Alexander complained four or five times to Adrian Taves, the hospital's director of education, that Kohl was "flamboyantly gay," but gay mannerisms caused Alexander no injury.

Plaintiffs also presented evidence that a few weeks before she was terminated, Alexander complained to Taves that Kohl had berated her in his office, and when she took the same complaint to the human resources director, her employment was implicitly threatened. These reports may have put the hospital on constructive notice that Kohl had created a hostile work environment, but not *prior* constructive notice, as no evidence suggested he did anything after the reports that injured

Alexander. The only event described by any witness as occurring after the reports was Alexander's termination.

Plaintiffs ague the memo discussed above with respect to MPHS put the hospital on constructive notice of the hostile work environment created by Kohl. But as discussed, an employee's vague, incomplete interpretation of a memo that was not produced or authenticated fails to establish the hospital had imputed reason to believe Kohl was unfit.

Plaintiffs argue the hospital is estopped under the doctrine of invited error from challenging the sufficiency of the evidence of negligent supervision because it obtained an in limine order excluding evidence that two employees had complained to the hospital about Kohl in 2008 and March 2009. We disagree.

The doctrine of invited error "prevent[s] a party from misleading the trial court and then profiting therefrom in the appellate court." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)

Here, the hospital did not mislead the trial court into erroneously excluding evidence of prior complaints—the court made no such order. In ruling on the hospital's motion the court granted the motion in part, and ruled that "[i]f Plaintiffs seek to introduce evidence of any conduct directed at other employees and which was not witnessed by Plaintiffs, a specific offer of proof must be made in advance." Plaintiffs made no such offer of proof.

### F. Damages

At the close of plaintiffs' case-in-chief, the hospital moved for partial nonsuit on the ground that plaintiffs' claimed damages should be cut off when they were arrested by the State of California. The trial court denied the motion on the ground that an issue of damages is not a proper subject for a nonsuit motion.

(The court's rationale was clearly erroneous, as a nonsuit motion may be made as to "some . . . of the issues involved in the action" (Code Civ. Proc., § 581c, subd. (b), including an issue of damages (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 58-59).)

After trial, the hospital moved for a JNOV with respect to plaintiffs' damages suffered after their arrest and prosecution. This motion, too, was denied.

The hospital contends the jury improperly awarded plaintiffs economic and non-economic damages they suffered after having been fired by College Hospital, and the trial court improperly denied their nonsuit and JNOV motions asserting this fact. We agree.

A wrongfully discharged employee's actual economic damage "is the amount of money he [or she] was out of pocket *by reason of the wrongful discharge.*" (*Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1502-1503 (*Stanchfield*).) In other words, a "causal link" must exist "between the adverse action and the damage." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713.) "The general rule is that the measure of recovery . . . is the amount of salary . . . for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. . . . [T]he employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 181-182, italics omitted.)

Here, damages plaintiffs suffered after being fired by *College* Hospital were caused by the state's decision to prosecute them, not by their wrongful discharge from *Community* Hospital. Any contribution by Community Hospital to this decision was absolutely privileged. (Civ. Code, § 47, subd. (b).)

Plaintiffs rely on *Stanchfield* for the proposition that although damages suffered by a wrongfully discharged employee may abate once he or she finds subsequent employment, they will resume if the employee loses that second job without fault. They argue the damages they suffered after their discharge from College Hospital were properly awarded because the termination was beyond their control. We disagree.

In *Stanchfield*, the plaintiff's employer breached an employment agreement when it terminated his employment. He found another job within days, but two months later was fired from that job for "good cause" (deceit and absenteeism). (*Stanchfield*, *supra*, 37 Cal.App.4th at pp. 1500, 1503.)

The court held the plaintiff was obligated to mitigate his damages from wrongfully losing the first job, by seeking and retaining subsequent employment. His misconduct in the second job constituted a failure to mitigate damages. The court implied without deciding that the plaintiff could have been seen to have mitigated his damages had the second termination been beyond his control. (*Stanchfield*, *supra*, 37 Cal.App.4th at p. 1501.)

*Stanchfield* is inapposite. Once plaintiffs obtained and retained (for a year) comparable subsequent employment at College Hospital, their damages from their termination from Community Hospital ceased. Their discharge from College Hospital was caused by the state's prosecution for patient abuse, not by College Hospital.

38

### G. Cumulative Error

Even no one error was itself prejudicial, we conclude that multiple errors combined to cause an unfair trial.

A "series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844; see *Johnson v. Tosco Corp.* (1991) 1 Cal.App.4th 123, 140.) However, "[l]engthy . . . trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*Hill*, at p. 844; see *Bruton v. United States* (1968) 391 U.S. 123, 135 [" 'A defendant is entitled to a fair trial but not a perfect one' "].)

Here, evidence that plaintiffs had cleared their names, presented in a context that could only mean they had been acquitted of criminal charges, informed the jury that the hospital's reason for terminating plaintiffs was pretextual.

Evidence that the hospital received three letters making the same allegations made by plaintiffs provided undue support for plaintiffs' allegations.

Evidence that Hellmannsberger witnessed several trivial, isolated acts by Kohl directed at others incorrectly implied that such conduct creates a work environment hostile to third parties.

Fragmentary evidence of a memo that was neither produced nor authenticated indicated to the jury that insubstantial evidence may support a claim, as did evidence of an isolated, overheard statement made to an unknown person for an unknown purpose; or post-facto complaints used to ascribe prior notice of an employee's unfitness.

And evidence of damages incurred long after the adverse effects of a wrongful termination had ceased informed the jury

that once an employer wrongfully fires an employee, it basically becomes the employee's unemployment insurer indefinitely, no matter how many jobs the employee subsequently obtains and loses.

Each of these signals was improper. Evidence that the plaintiffs had somehow cleared their names in criminal proceedings, or that the hospital had received post-termination complaints about Kohl, was inadmissible for the purposes for which the jury must ultimately have considered it. Evidence of isolated or trivial events or post-facto complaints or a fragment of a memo or overheard conversation was insufficient as a matter of law to support the uses the jury made of it. And of course a causal link must exist between a wrongful termination and damages suffered.

The message conveyed to the jury by the errors was clear: the hospital was liable. This was unfair. Given the numerosity of the errors, and their quality, we conclude it is reasonably probable the jury would have reached a different result without them.

## DISPOSITION

The judgment is affirmed as to MCA and reversed as to MPHS and Community Hospital. The trial court is directed to enter judgment in favor of MPHS entirely and in favor of the hospital on all of Hellmannsberger's claims and Alexander's and Harris's claims for defamation and negligent supervision. The trial court is directed to order a new trial as to Alexander's and/or Harris's claims for sexual harassment, sexual orientation discrimination, failure to investigate and prevent harassment and discrimination, retaliation, and wrongful termination in violation of public policy. Each side is to bear its own costs on appeal.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

41

Filed 3/10/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JUDY ALEXANDER et al.,<br><br>     Plaintiffs and Respondents,<br><br>     v.<br><br>COMMUNITY HOSPITAL OF LONG BEACH et al.,<br><br>     Defendants and Appellants. | B279155, B280916<br><br>(Los Angeles County<br>Super. Ct. No. BC426353)<br><br>ORDER CERTIFYING<br>OPINION FOR<br>PUBLICATION |

THE COURT:

        The opinion filed in the above-entitled matter on February 13, 2020, was not certified for publication in the Official Reports. Pursuant to California Rules of Court, rule 8.1105(c), this opinion is now ordered published in the Official Reports.

_____

ROTHSCHILD, P. J.          CHANEY, J.          WEINGART, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.